STATE OF MAINE
Knox, S.S., Clerks Office
SUPERIOR COURT

DEC 16 2002

RECEIVED AND FILED
Susan Guillette, Clerk

DONALD L. GARBRECH
LAW LIBRARY

DEC 17 2002

STATE OF MAINE

KNOX, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-00-018
JRA - KNO - 12/16/2002

FRANCIS X. LYONS and
MARILYN C. LYONS,

Plaintiffs

v.

MARILYN L. HOTCH,

Defendant

**DECISION AND ORDER**

This matter is before the court on the defendant's first motion for partial summary judgment, one of numerous dispositive motions filed in this multi-volume case which seeks to resolve disputes between two neighbors in Owls Head.

This motion, filed on April 5, 2001, asks for summary judgment in the defendant's favor on the plaintiffs' claims that the dimensions of the former's garage and its use violates the terms of the deed which created the easement for the construction of this structure on what was to become the plaintiffs' land. The motion also seeks disposition in the defendant's favor on the plaintiffs' claims that her use of part of the garage for her mediation business violates the town's zoning ordinances.[1] The plaintiffs' reply asks that they be granted partial summary judgment on this aspect of the parties' dispute as M.R. Civ. P. 56(c) permits.

---

[1] In what was to become characteristic of this case, this motion is accompanied by a 22-page memorandum of law and an 18-page, 115 paragraph statement of undisputed facts. The former was authorized by this court, the latter contradicts the plain text of M.R. Civ. P. 56(h)(1) which mandates that a motion for summary judgment be accompanied by a ". . . short and concise statement of material facts . . ." The plaintiffs' reply comports with M.R. Civ. P. 7(f) but adds an additional 30 paragraphs of material facts in addition to their reply to the defendant's 115 paragraph statement which violates the text, if not the intent, of M.R. Civ. P. 56(h)(3).

From the submissions of the parties in support of, and in opposition to, this motion, the following facts may be found:

Marilyn Hotch (Hotch), the defendant, purchased a lot in 1989 from Mary Nightingale (Mary) in a transaction negotiated by her husband Richard A. Nightingale (Richard) who owned the adjacent lot. His lot ultimately became the plaintiffs' property in 1996. As a result of this 1989 transaction, Hotch was given a deed from Mary which contained an easement over a portion of Richard's land to use the garage then existing there or to replace it with a new garage building within the confines of that easement and limited in size to 22 feet by 18 feet. As noted, it is the size and use of that building as constructed by the defendant thereafter which the plaintiffs protest.

In 1994, Hotch built a one and a half story garage on this easement. Since its construction, Hotch has used this building to park her car, store personal property and for "thinking, writing, and telephone conversations" related to her profession as a "self-employed mediator, facilitator and guardian ad litem." Defendant's Statement of Undisputed Facts, ¶¶ 61, 62.

In their complaint, the plaintiffs' first claim that the height of the garage at one and a half stories[2] exceeds the size of the building as permitted in the deed to Hotch from Mary.

The August 31, 1989 deed to Hotch provides her with a perpetual right and exclusive use of "the existing one-story garage" situated on Richard's land and depicted on a survey plan prepared by Frank O. Holdgate on August 25, 1989. Hotch Affidavit,

---

2 The plaintiffs call Hotch's garage a two-story structure; she calls it a one-and-a-half story structure. The difference in this description is unimportant. If the easement in the deed limited the structure to one story, the current building violates that provision; if not, a second story, full or half, would not.

2

Exhibit A. It also gave her "the right to use, maintain, modify, replace, and enlarge the existing garage building and to construct a new garage building within the zone designated on the Plan as 'Garage Easement,' provided that the existing garage as enlarged and any newly constructed garage shall not exceed twenty-two (22) feet by eighteen (18) feet in size." *Id.*

The plaintiffs argue that this language can only be construed to mean that Hotch could build a one-story garage on this easement in replacing the old one there. In their view, "modifying" or "enlarging" the old garage or replacing it with a "modified" or "enlarged" structure must have meant lateral, but not vertical, change, there being no reason to interpret the deed as allowing a change in height. This is so, they claim, because the right to the garage is described as the right and exclusive use "of the existing *one-story* garage" (emphasis supplied), *id.*, which text must have been in the deed for a reason, namely the grantor's intent that Hotch only "have the right to use, modify, enlarge or replace a garage of that particular size and character." Plaintiffs' Memorandum, p. 6.

This argument can be distilled to two propositions: first, the bald assertion that the garage must be limited to one-story because there is no reason to believe that the deed would permit otherwise, and, second, the single descriptive reference to the old, existing garage as one-story, meant that any future garage must also be one-story. In the court's view, these contentions are without merit.

First, in examining the deed instrument in its entirety, *Maine Drilling & Blasting v. Insurance Co. of North America*, 665 A.2d 671, 675 (Me. 1995); *Haight v. Hamor*, 22 A. 369, 371 (Me. 1891), as it relates to the garage, the plain meaning of the text is the opposite of that suggested by the plaintiffs, namely that there is no reason to believe that the deed

3

can be read to permit a building higher than one-story. Instead, the deed plainly gives Hotch the use of the *existing* one-story garage; that is, the use of that structure as it then existed. The very next sentence, however, unambiguously gives her the right to "modify, replace and enlarge" that existing building with the sole limitation that it not exceed 22 by 18 feet.[3] It is impossible not to interpret that language as allowing for change in the building's size, appearance and characteristics in all respects, save its lateral dimensions. Indeed, by specifically describing these lateral dimensions as the only limitations on the size of the building, and delineating no restriction as to its height, when taken together with the license to "modify, replace, and enlarge" the garage, the sole conclusion to be drawn is that the grantor intended no restriction on the height of this garage.

Because the court finds this text and its obvious interpretation to be unambiguous, it is unnecessary to explore what the intentions of the parties may have been in adopting the language cited. Nevertheless, the intentions of the parties as "objectively manifested" recent to the conveyance, *Fine Line, Inc., v. Blake*, 677 A.2d 1061, 1064 (Me. 1996), support the proposition that Hotch was to be given considerable latitude in the design of her new garage. In this regard, the final purchase and sale agreement which preceded the execution of the deed represented that "an *oversized* one-car garage . . . shall be constructed by the owner [Mary] with design approval by buyer [Hotch], on the abutting property . . ." Plaintiffs' Index of Attachments, tab 6, Plaintiffs' Exhibit 1. This language, particularly when contrasted with the text of the contract it replaced, yields an understanding of the intent of the seller and buyer that the latter

---

[3] Hotch conceded at oral argument that her garage overburdens the easement by a short distance. Whether this means it exceeds these lateral dimensions or intrudes on the plaintiffs' fee is uncertain. Either way, resolution of this issue can be preserved for trial.

4

was to have an oversized garage, the design of which was subject to her approval. Not only is there no reference here to this garage being one-storied, it is contemplated that it will be larger than ordinary and be designed by the buyer, presumably with the dimensions she favors.

From all this, it cannot be mistaken that the deed itself and the parties' intentions contemplate a garage that is not limited in height.[4]

The plaintiffs' contention that the use of the modifier "one-story" when referencing the use of the garage means that all future garages on that site must also be of one-story is equally unavailing. First, the word "one-story" is preceded by the word "existing," i.e., what is physically extant at the time the deed was executed. As already discussed, the deed gave the grantee the right to change what then existed by modifying, replacing, or enlarging the structure. Logically, that can only mean that the grantee had the right to change what then existed, namely the one-story nature of the garage.

Finally, the court concurs with the defendant's argument that the word "one-story" serves only to identify the building referenced in the deed. That document, in describing the garage, tells its reader that it is "the existing one-story garage . . . the location of which is depicted on the Plan." Hotch Affidavit, Exhibit A. "The Plan" is the plan of Frank O. Holdgate referenced in the deed. That document identifies the garage as "1 STY W/F GARAGE." *Id.* Exhibit B. Thus, it is obvious that the drafter and the parties to the deed determined that they would be certain there was no ambiguity as to

---

[4] Richard and Mary Nightingale have both testified that they did not intend to limit the height of the garage. R. Nightingale Affidavit, ¶ 12; M. Nightingale Affidavit, ¶ 6; R. Nightingale deposition, p. 20.

5

the building referenced by telling a reader that the garage currently exists, and is one-storied, and wood-framed as depicted in Holdgate's plan.

In the court's view, nothing more can be read into the use of the word "one-story" than that it denotes a description of the then existing building which the defendant had the right to modify or enlarge. Accordingly, the court must also conclude that the plaintiffs, as the holders of the servient estate, have no right to now limit that garage to one-story.

As already noted herein, the plaintiffs also object to Hotch's use of the loft area of her garage "to conduct professional thinking, writing and telephone conversations." Defendant's Statement of Undisputed Facts, ¶ 94.[5] They do not challenge her contention that she uses her property and the loft for no other business activities, such as meeting with clients or the like. Nevertheless, while the plaintiffs concede that a garage can be used for other purposes, they say that the deed to Hotch is to be construed so that the defendant would have the right to construct a building to park a car and nothing more, based on a dictionary definition of "garage" and a 1965 Kentucky case to like effect. *Mascolino v. Noland & Cowden Enterprises, Inc.*, 391 S.W.2d 710, 712 (Key. App. 1965). Plaintiffs' Memorandum, p. 7.

Additionally, the plaintiffs argue that the extrinsic evidence of the parties' intent as to the conveyance of the easement for a garage is that such a structure could be used only for storage. In this regard, they point to the initial purchase and sales agreement between Mary and Hotch which provided for Mary to build a "garage/storage

---

[5] In this document and her affidavit, Hotch advises that the loft area of the garage where she engages in these activities is situated on that portion of the garage which is on her property. The plaintiffs have admitted that this assertion is true. Apparently, then, part of the garage sits on the defendant's property and part sits on the easement over the plaintiffs' property but that the loft where Hotch does her thinking, writing and phone-calling is on her land.

6

structure in place of the current garage . . . sufficient to garage one car and provide storage for lawn maintenance vehicles [etc.]. . ." Plaintiffs' Index of Attachments, tab 9, exhibit 30. This contract, however, was superseded by a second purchase and sale agreement which, as noted *infra*, made no reference to the use of the garage but, instead, described it as "oversized" with its design to be approved by the buyer. *Id.* tab 6, exhibit 1. From this, it may fairly be inferred that if the grantor intended to limit the use of the garage to parking and storage, she abandoned that position before the final, and binding, contract was executed. Indeed, in the deed itself, there is no reference to limitations in the use of a new "garage building." Hotch Affidavit, Exhibit A, p. 2. Thus, an examination of the documents tells one very little about restrictions on the use of the garage building.

Because the language in the deed is ambiguous, the court must seek to ascertain the intent of the parties, and it may be interpreted "with reference to the reason, or motive, upon which the Grantor proceeded in using the language in question." *C. Company v. City of Wesbrook,* 269 A.2d 307, 309 (Me. 1970). In ascertaining the intent of the parties, the court may consider extrinsic evidence which might otherwise be excluded by the parol evidence rule. *Whit Shaw Assoc. v. Wardwell,* 494 A.2d 1385, 1387 (Me. 1985). Finally, though, when there is an ambiguity, the deed must be construed more favorably to the grantee. *C. Company v. City of Westbrook, id.*

In order to expose the intent of the grantor, the defendant has submitted Mary's affidavit. In this document, Mary endorses what her husband said in a separate affidavit, namely that she had no intention to limit the use of the garage and that, if she had, she would have included words in the deed expressing such limitations. Her

husband, who negotiated the terms of the deed, and whose property would be affected by the garage easement, as noted, said the same thing.

The plaintiffs argue that this evidence of the grantor's intent should be disregarded. Although they cite no evidence to contradict Mary's affidavit, they argue that Richard in a later deposition stated he had no intent on this subject and, inferentially, that lack of intent is to be ascribed to Mary. Richard's deposition, however, says that he gave no thought whatsoever to what Hotch might use that garage for in the future when he was negotiating the conveyance of the property to her. R. Nightingale dep., p. 18. He also testified in that deposition that if he had intended to impose any limitations on the use of the garage he would have known how to accomplish that, and, further, that he did not intend to impose such conditions or restrictions on the property. *Id.*, p. 20. In the court's view, this statement cannot be read as contradicting his affidavit. The latter can fairly be read as a statement that the Nightingales had no intent to limit Hotch's use of the garage. The former that Richard, at best, had no thoughts as to Hotch's use of the garage in the future when negotiating the deed and had no intention to limit them. Thus, if Richard had no thoughts as to the future use of the garage, he must not have intended to limit its use.

Moreover, as noted, Mary, the actual grantor of the easement which had been conveyed to her, has endorsed the first statement by her husband that there was no intent to limit the use of the garage. The plaintiffs have failed to rebut her statement, except by reference to Richard's later deposition testimony to which Mary, apparently, has never agreed. Accordingly, her statement must be deemed to have been admitted because the record citation relied on by the plaintiffs does not contradict or deny this statement. M.R. Civ. P. 56(h)(2).

8

The plaintiffs also argue that even if the intent of the parties to the deed was that there were no restrictions intended as to its use, the court should not rely on such testimony because "issues of intent are not suitable to determination under Rule 56." Plaintiffs' Memorandum, p. 10. This is because, they say, a witness' self-serving affidavit as to his intent cannot serve as a basis for summary judgment where there is evidence inconsistent with that affidavit.

At least as to this case, these arguments are unpersuasive. First, the court is required to look to the intent of the parties when attempting to resolve an ambiguity. *Northern Utilities v. City of South Portland*, 536 A.2d 1116, 1117 (Me. 1988). Second, there is no reason to discount the import of the Nightingales' sworn statements. There is no evidence that they are self-serving; they are not parties in this action and the plaintiffs have referred the court to no evidence which might bear on the reliability of their statements. Third, contrary to the plaintiffs' arguments, there is no evidence in the record that their intent was other than what they have said. The original purchase and sale agreement to which the plaintiffs attach much weight was superseded. Moreover, the only other evidence on the intent of the parties as to the use of the garage is the testimony of the defendant herself which is consistent with that of the Nightingales. From all of this, the court must conclude that the deed, if ambiguous as to the use of the garage, can only be interpreted by reference to the intent of the parties to the deed. This mutual intent, as established in the record properly before the court, is that no restrictions were intended as to the use of the garage.[6] Accordingly, the court must

---

[6] Even though this court concludes that the deed and the extrinsic evidence of the intent of the parties to that instrument show that there is no restriction as to the grantee's use of the garage, that does not mean that her uses are unfettered. However, the application of local ordinances aside, the Law Court has always required "some reason to suppose that the absence of limiting language does not connote the absence of limits." *Pettee v. Young*, 2001 ME 156, ¶ 123, 783 A.2d 637, 640. No such reason has been provided here other than plaintiffs' insistence that a garage can only be used to park cars and

9

conclude that the current use of the garage is not prohibited by the deed of Mary to Hotch.

By her motion, the defendant also claims that her professional activities in the loft of her garage involving thinking, writing and telephone conversations do not violate Owls Head's zoning ordinance so that the plaintiffs have no basis to seek the court's enforcement of these ordinances against her.

While the defendant offers an array of persuasive arguments to support her contention that her professional activities in her loft and in her home do not violate local land use ordinances, her contentions are unnecessary. That is because since the pending motion was filed, the Law Court decided the case of *Charlton v. Town of Oxford*, 2001 ME 104, ¶¶ 10-34, 774 A.2d 366, 371-77 in which it held that a private party has no cause of action in nuisance based upon another's violation of local zoning or land use ordinances. That being the state of our law, the plaintiffs may not rely on Hotch's alleged violation of Owls Head zoning ordinances to secure a remedy against her.

Based on the foregoing, the entry will be:

> Defendant's Motion for Partial Summary Judgment filed on April 5, 2001, is GRANTED as to plaintiffs' claims articulated in counts III and IV of the Amended Complaint and Judgment is to be ENTERED for the defendant thereon. As an exception to this Order, however, because the defendant has conceded that the lateral dimensions of her garage exceed the easement granted to her in the deed from Mary Nightingale, the plaintiffs are entitled to remedies via count III of the Amended Complaint as to these violations of this easement as the court may order at trial.

So ordered.

Dated: December ___13___, 2002

John R. Atwood
Justice, Superior Court

---

store property, even though common experience is to the contrary.

10

Date Filed __10/6/00__       Knox      Docket No. __RE-00-018__

                       County      **MARSANO, J. RECUSES 9/4/01.**

Action __Easements__      **ATWOOD, J. SPECIALLY ASSIGNED 12/26/01**

FRANCIS X. LYONS and MARILYN C. LYONS    vs.    MARILYN L. HOTCH

| | |
|---|---|
| Plaintiff's Attorney<br>Christopher C. Taintor, Esq.<br>PO Box 4600<br>Portland ME 04112-4600<br>774-7000 | Defendant's Attorney<br>Randal E. Watkinson, Esq. **W/D 6/10/02**<br>PO Box 248<br>Rockland ME 04841-0248<br>594-8400<br><br>Marilyn Hotch, Pro Se<br>92 Bellevue St<br>Owls Head ME 04854<br>596-7847 |

| Date of Entry | |
|---|---|
| 10/10/00 | On 10/6/00, Complaint, filing fee and Summary Sheet filed.<br>Case File Notice mailed to Attorney Taintor. |
| 10/13/00 | Return of Service on Summons filed:<br>—Marilyn L. Hotch served on 10/5/00 in hand. |
| 10/24/00 | Motion for Enlargement of Time and Proposed Order filed by Attorney Randal Watkinson. |
| 11/13/00 | On 11/6/00, Defendant's Answer and Counterclaims filed by Attorney Watkinson. |
| 11/16/00 | On 11/15/00, Order filed:<br>Without objection, Defendant's motion for an enlargement of time is hereby granted. The Defendant shall file her Answer and any counterclaims on or before November 7, 2000.<br>The Order dated Nov. 15, 2000 is incorporated in the docket by reference.<br>Dated: 11/15/00<br>Atwood, J.<br>Copy mailed to Attorneys Taintor and Watkinson. |
| 11/16/00 | On 11/15/00, Scheduling Order filed:<br>Discovery deadline is July 15, 2001.<br>Dated: 11/15/00<br>Atwood, J.<br>Copy mailed to Attorneys Taintor and Watkinson. |
| 11/30/00 | On 11/29/00, Notification of Discovery Service filed:<br>—Plaintiffs' Request for Production of Documents Propounded to Defendant Served on Attorney Watkinson on 11/28/00. |
| 11/30/00 | On 11/29/00, Plaintiffs' Reply to Counterclaim filed by Attorney Taintor. |

(GO TO NEXT PAGE)

STATE OF MAINE

KNOX, ss.

STATE OF MAINE
Knox, S.S., Clerks Office
SUPERIOR COURT

AUG - 1 2003

RECEIVED AND FIL
Susan Guillette, Clerk

DONALD L. GARBRECHT
LAW LIBRARY

AUG 14 2003

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. RE-00-018

FRANCIS X. LYONS
and MARILYN C. LYONS,

Plaintiffs

v.                                                      **DECISION AND ORDER**

MARILYN L. HOTCH,

Defendant

## I. Introduction.

This matter is before the court on the plaintiffs' second amended complaint[1] (complaint) and the defendant's amended counterclaim (counterclaim). A nonjury trial was conducted, the parties have filed extensive post-hearing memoranda and proposed findings so that the case is in order for disposition.

This case involves a variety of competing claims between two neighbors who own small abutting lots on the ocean in Owls Head. Legal characterizations aside, the plaintiffs, Francis and Marilyn Lyons (Francis, Marilyn, collectively, "Lyons") object to the location and use of the defendant's garage and her deck which joins the garage to her house, her mowing and planting on an easement, and her planting of trees which block their view. They have expressed these grievances in 10 counts, three of which are no longer to be considered because they have either been withdrawn or disposed of by separate orders of this court.

---

[1] There are two second amended complaints – one filed on June 27, 2001, the other on October 16, 2001. The parties agree that it is the second of these two pleadings which governs the plaintiffs' claims.

Counts I and II[2] sound in trespass and allege, in count I, that the defendant's garage rests partially on the Lyons' property for which they seek compensatory and punitive damages. In count II, the plaintiffs ask for a declaratory judgment that the defendant's garage is on their land, that she has no right to mow, plant on, or alter any part of the plaintiffs' land not subject to an easement, and has no right to enter upon, pass over or use any part of their land outside of any easements. The plaintiffs also seek injunctive relief, ordering the defendant to remove so much of her garage which rests on their property, barring her from mowing, planting or altering the plaintiffs' land outside of any easements, ordering her to restore their land to its previous condition, and barring her from entering on or using any portion of the plaintiffs' land not subject to easement rights.

In counts V and VI, the plaintiffs allege nuisance in that, as to the first of these claims, they say that the defendant's deck violates the Owls Head zoning ordinance and is therefore a statutory nuisance so that the court ought to order its removal.[3] In count VI, it is claimed that the defendant planted trees along the parties' boundary in violation of 17 M.R.S.A. § 2801 so that they are a nuisance by the terms of that law or are a common law private nuisance. The plaintiffs ask that these trees be removed or trimmed so that they do not obstruct their views.

---

[2] Count III also alleges trespassory conduct in that the plaintiffs claim there that the vertical dimensions and use of the garage overburden the easement which permitted its construction. This court's order of December 13, 2002, granted summary judgment to the defendant on this claim. That order, however, recognized the parties' agreement that the lateral dimension of the garage did exceed the prescriptions of the easement so that this violation must be addressed in the final judgment in this case.

[3] In count IV, the plaintiffs allege that the construction and use of the garage violates Owls Head's zoning ordinance and is a statutory or common law nuisance. In this court's order of December 13, 2002, the court granted summary judgment to the defendant on the claim that the garage was a nuisance in that it allegedly violated a zoning ordinance. That the entry of that date referred to the Amended Complaint instead of the Second Amended Complaint is of no consequence; count IV of each pleading is nearly identical. Accordingly, count IV will be further addressed in this order only as to the claim that the garage is a common law nuisance.

2

Finally, in count X, the plaintiffs assert an emotional distress claim.[4] Here, the plaintiffs say that the defendant's entire course of conduct knowingly or recklessly caused them emotional distress for which they seek compensatory and punitive damages.

For her part, the defendant, Marilyn Hotch (Hotch) seeks remedies for Francis' alleged mistreatment of the parties' common septic system and asks for declarations and injunctions as to its future use and governance. She asks for comparable remedies as to the parties' mutual obligations for mowing, snowplowing, and electrical costs for a common water pump.

She also claims that the Lyons poisoned her trees, stole her driveway lamp, and dumped material on her property, and wants these insults remedied.

Hotch also alleges that the plaintiffs installed a flagpole in violation of Owls Head's zoning ordinances and wants its removal ordered.

The defendant further alleges that the plaintiffs have harassed her by their various actions and wants such activity enjoined.

Last, she says that the plaintiffs have trespassed on her property, particularly her exclusive easement zones, which she also wishes to have enjoined.

The defendant has articulated these claims in 19 counts, 16 of which remain for disposition.

Counts I, II, IV, V, VIII, IX, XII and XIX all address the defendants' grievances stemming from the use and maintenance of the parties' common septic system.

---

[4] The intervening counts, VII, VIII and IX, are no longer before the court for consideration. Count VII was withdrawn by the plaintiffs in their post-trial memorandum. *See* Plaintiffs' Post-Trial Brief, p. 7. Summary judgment was entered for the defendant on counts VIII and IX. *see* Orders of December 13, 2002, and December 31, 2002.

In counts I and II of the counterclaim, the defendant says that the parties share a septic system, but that some elements of the system are exclusively hers. Accordingly, in count I she asks for a declaratory judgment that the plaintiffs have no right to "touch or handle" the parts of the system that are hers and that she has an equal right with the plaintiffs to "access, touch and handle" the elements of the system to which they have common or joint rights, even if those parts of the system are on the plaintiffs' property. Moreover, she asks for a declaration that no party has the right to unilaterally maintain, repair, or replace "parts of the common system without participation by the other party." In count II, she asks for an injunction barring the plaintiffs from handling the components of the system common to the parties, except an external control switch for the pump which is located on their property and the alarm which sounds when the pump is not working. In this count, Hotch also asks that the plaintiffs be required to hire only qualified people to work on common parts of the septic system.[5]

Counts IV, V and VIII allege that the parties had an agreement to reconnect the wires running from the defendant's home and the septic system pump and to alternate the control of that pump between their two residences on a monthly basis. Hotch says in count IV that the defendant breached that contract and wants money damages awarded. In count V, she asks the court to order specific performance of the contract, requiring the Lyons to alternate the septic pump control switch monthly. In count VIII, Hotch asks the court to declare that the monthly exchange of septic pump responsibilities is fair as would be the sharing by the parties of the cost of electricity for the pump, the water pump, snowplowing of their common drive, and mowing.

---

[5] Count III, which was similar to count II, has been dismissed by the defendant.

4

In count IX, the defendant alleges that she has been damaged by the plaintiffs' trespasses on her property by cutting the electrical wires leading from her house to the septic pump.

In count XII, she asks for an additional declaration by the court that the plaintiffs' plantings and placement of rocks on or near the septic system create impediments to its maintenance and that if they need to be removed for this purpose, the plaintiffs should be held responsible for these costs. In this regard, the defendant asks that this declaration recognize that her obligation to restore the land after septic maintenance be based on its condition before the plaintiffs installed improvements there.

Count XIX, which is similar to count I, asks for a declaratory judgment that the plaintiffs have no right to use any portion of the defendant's exclusive "components" or to enter on or pass over her exclusive easements, and also seeks an injunction barring such activity.

In counts IX, X, XI and XVII, the defendant adds to her trespass claims by alleging, in count IX, that the plaintiffs entered on her land and damaged her ornamental trees and also entered on to her exclusive garage and parking easements. She asks for money damages for these intrusions and in count X, asks for statutory and punitive damages for the injury to her trees and land. In count XI, she asks the court to enjoin the plaintiffs from "applying, dumping, or dispensing" materials on her property which may cause it harm. Count XVII appears to make similar claims as count IX by alleging that the plaintiffs negligently damaged her property.

Counts XIII and XIV address the defendant's claim that the plaintiffs removed her driveway lamp. She asks in these counts for damages, compensatory and punitive, as well as a declaration that she has the right to illuminate access to her driveway.

5

Counts XV and XVI address the defendant's grievance as to the installation of the plaintiffs' flagpole. Here she says the flagpole was erected in violation of Owls Head's zoning ordinance so that it is a statutory nuisance. She also claims it is a common law private nuisance. Either way, the defendants wants an injunction commanding the pole's removal.

Finally, in count XVIII, the defendant claims that the plaintiffs have harassed and intimidated her by their various interferences with her property rights as alleged in the other counts in the counterclaim so that an injunction barring such actions be issued.

## II. Plaintiffs' Claims.

As noted, *infra*, counts I and II of the Second Amended Complaint allege that the defendant's garage encroaches on the plaintiffs' land and that she has trespassed there, disrupting and altering their property. They want a declaration as to this encroachment and an order removing so much of "the structure" which rests on their land. They also want a declaration that the defendant has no right to mow, plant on or alter any part of the plaintiffs' land outside of her easements and an injunction barring such acts or entering upon or using any part of the plaintiffs' land not subject to easements.

To properly address the merits of these claims, particularly as to the incursion of the defendant's garage on the plaintiffs' land, it is important to recite some of the history of the development of the defendant's lot.

In 1989 Hotch negotiated the purchase of her lot, then owned by Mary Nightingale, with Mary's husband, Richard, who owned the adjoining property which ultimately became the Lyons'. Apparently, because of zoning restrictions as to lot size and the need for various improvements in Mary's lot before Hotch would buy it, Richard conveyed several easements over his land to Mary so that she, in turn, could convey land suitable for Hotch's plans. One of these easements which was ultimately

6

conveyed to Hotch concerned a garage and gave her "a perpetual and exclusive use of the existing one-story garage" sited partially on Richard's land. Pl.'s exh. 5. It also granted her "a perpetual exclusive easement" to use the zone marked as garage easement on the plan developed for this conveyance for access, utilities and "the right to use, maintain, modify, replace and enlarge the existing garage building and to construct a new garage building" within this zone. *Id.* The deed goes on to state, however, that any new garage would not exceed 22 feet by 18 feet in size. Along with this grant, the defendant was given an easement over Richard's land to repair and maintain the garage which would not exceed 10 feet from the perimeter of this building. According to the deed this 10-foot margin would "be subject to the common usage" of Richard, and his assigns and the grantee where "it extends outside the exclusive 'Garage Easement...'" *Id.*

After the defendant accepted the deed with these provisions, she replaced the existing garage with a new one which was completed in 1994. This structure complied with the dimensional requirements in the deed as to its width in that it is less than 18 feet wide, but did violate the length requirement of 22 feet by approximately two inches.

More important to this controversy, however, is the circumstance that the west wall of the garage extends beyond the garage easement by 3 3/4 inches along approximately one-half the distance of that wall. Further, the west side of the garage has a lean-to or shed constructed along that wall which, although it is open-faced and has no floor, extends the encroachment beyond the garage easement by an additional two feet. Taking these measurements together, and accepting surveyor Beal's measurements as accurate, the westerly side of Hotch's garage extends beyond the "exclusive" garage easement and on to the plaintiffs' land, by two feet, 3 1/3 inches.

7

This incursion is within the garage maintenance easement zone conveyed to the defendant to which the plaintiffs have a right of "common usage." Pl.'s exh. 5.

Although the defendant contests the accuracy of these measurements, she does agree that her garage and its lean-to cross the line of her exclusive easement and that the plaintiffs are entitled to some remedy for this incursion on to their property.

The parties differ sharply as to how this situation is to be remedied. The plaintiffs ask for compensatory damages or, preferably, an order removing "every part of the structure that encroaches upon that portion of the Plaintiff's property that is outside the Garage Easement." Second Amended Complaint, ¶ 22(ii). Not surprisingly, the defendant argues that any remedy be limited to money damages as she has calculated them.

Because removal of the west wall of the defendant's garage entails the potential application of equitable relief in the form of an injunction, the parties cite the court to the familiar case of *Ingraham v. University of Maine at Orono*, 441 A.2d 691, 693 (Me. 1982) which outlines the criteria which must be established by a grievant before an injunction may issue. They are: "(1) the plaintiff will suffer irreparable injury if the injunction is not granted, (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant, (3) that plaintiff has exhibited a likelihood of success..., (4) that the public interest will not be adversely affected by granting the injunction." *Id.*

According to *Walsh v. Johnston*, 608 A.2d 776, 778 (Me. 1992), the court should consider these criteria together in determining whether injunctive relief is appropriate. Of these four factors, only two are germane, namely the potential for irreparable harm to the plaintiffs, and the comparison of that party's injury with the harm which granting the relief would impose on the defendant. In doing so, it must be recognized that the

8

rightful owner of the property is not necessarily required to part with his property even when it would be much cheaper for the encroacher to pay money damages. *Id.* Instead, the court is to engage in a balancing of relative hardship to the parties and the equities between them when considering the selection of the appropriate remedy. *Id.*

In applying this guidance to the facts in this case, the court concludes that the equities compel an injunction issue only as to the two-foot lean-to and its roofline. It invades the plaintiffs' property by two feet and can be removed at the modest cost of approximately $1,300. It also would entail little or no loss of use of the garage building to the defendant and cure the major encroachment on to the plaintiffs' land with little effort or expense.

Removing the lean-to, however, still leaves part of the west wall of the defendant's garage over the plaintiffs' property line by approximately 3 3/4 inches. In the court's view this intrusion does not call for the removal of this wall for the following reasons:

First, the court finds that the misplacement of the wall was neither willful, nor reckless, but stemmed from inadvertent misapprehension by the defendant of where the garage would be situated. Also, the garage was completed in 1994, but the plaintiffs bought their land two years later. Thus, they bought their lot with the intrusion in place, apparently content to buy the property in the condition in which they found it and without a survey to confirm what was theirs and what was their neighbor's. Indeed, the circumstances of this case show that the location of the garage never became an issue for the plaintiffs until unpleasantries arose between the parties concerning the management of the septic system and their respective rights to other areas burdened by easements. Thus, in 2000, the Lyons hired a surveyor who discovered the garage intrusion on to their property which they now want remedied.

9

Next, the overlap of the defendant's garage is, as noted, within the area to which she has a related easement, even though the fee is the plaintiffs.' Thus, the intrusion onto the plaintiffs' property occurs where their interests are already partially encumbered by the defendant's right of use.

Moreover, the location of the garage is not in an area which would likely affect the plaintiffs' use and enjoyment of their property. Theirs is a seasonal residence facing the ocean and the garage is well out of sight of this important characteristic of their property. Said differently, leaving the west wall of the garage where it is causes little or no damage or inconvenience to the plaintiffs so that it ought to be removed. Conversely, moving the wall so that the garage is entirely within the exclusive garage easement would cost the defendant approximately $8,398. In sum, the court concludes that the plaintiffs have not met their burden of persuasion as to the criteria which would support the issuance of an injunction to remove the entire west wall of the defendant's garage. *Ingraham v. University of Maine at Orono*, 441 A.2d at 693. In reaching this conclusion, the court is mindful that allowing the west wall of the defendant's garage to remain on the plaintiffs' land and therefore not reducing its size may result in restrictions on further structural development of the plaintiffs' house or their future construction of outbuildings as the local zoning ordinance limits non-vegetative areas to 20% of a lot in the shoreland zone.

Instead, the court must award the plaintiffs monetary damages for this permanent loss of their property, even though the area involved is quite small. In this regard, Marilyn testified that the plaintiffs' property has been reduced in value by $50,000 to $70,000 by the overburdening of the garage easement and the encroachment of the garage on to their property. She offered no basis for this opinion, however, and the plaintiffs presented no expert testimony on the reduction of the value of their

10

property due to the encroachment of the garage wall there. In sum, this estimate of loss is simply speculation and will not suffice to meet the plaintiffs' burden of proof as their damages from this encroachment.

The defendant, however, presented an expert who calculated the area of encroachment on the plaintiffs' land as 21 square feet. He then multiplied that by the square foot value of the Lyons' property, namely $3.89, and came up with the value of the loss to them of $30.57 as of the date of the Lyons' purchase of their land.

While it is true that it is difficult to perform an appraisal as to the loss of value due to an encroachment, the court concludes that the defendant's appraiser, well qualified in this field, took a reasonable course in calculating the plaintiffs' loss. He considered the neglible impact on the utility of the property, the small area covered by the encroachment, the potential stigma on the property in having this feature, and the increased value in the property since the Lyons' purchase in 1996, in arriving at this approach. There being no other competing means to value the Lyons' loss, the court adopts this appraiser's conclusion so that damages in the sum of $30.57 are to be awarded to them because of the encroachment of the defendant's west garage wall on to their property.

Counts I and II also suggest claims that the defendant has trespassed on the plaintiffs' property, mowed and planted there, and altered their land. For these trespasses, the plaintiffs seek declaratory and injunctive relief, as well as money damages.

The evidence supporting these claims is slight and they have been given little attention in the parties' post-trial submissions. Nevertheless, the court finds that the defendant's mowing contractor has mowed the grass on the plaintiffs' land on occasion. The court also finds that the defendant has made plantings on the easement described

11

in her deed from Mary Nightingale as a "12' way" when the purpose of the easement is only "for ingress, egress, regress (sic) and for the installation, maintenance and repair of utility services." Pl.'s exh. 5. Because the use of that easement by the defendant is thus limited, the court must conclude that the defendant cannot obstruct the right-of-way with plants and the plaintiffs are not barred from its use in a manner not inconsistent with the defendant's rights. According to the deed, the 12-foot right-of-way is on their land and they have the right to use it in common with the defendant. *Id.*

Finally, the court finds that the defendant has, on at least one occasion, entered on the plaintiffs' land to take photographs.

As to the remedies on count I, the court finds the plaintiffs have suffered no actual damages from the defendant's trespasses so will award them $10 as nominal damages. The court also finds that the plaintiffs have failed to establish that the defendant's trespasses were accompanied by ill will or malice, express or implied, so that punitive damages might be awarded. *See Tuttle v. Raymond*, 494 A.2d 1353, 1361-64 (Me. 1985).

As to count II, the court will find and declare that the west wall of the defendant's garage encroaches on the plaintiffs' property, but will order only the removal of the lean-to and award damages in the sum of $30.57 in count I for this encroachment. The court will also find and declare that the defendant has no right, by virtue of her deed from Mary Nightingale, to mow, plant or physically alter any portion of the plaintiffs' land, not encumbered by her exclusive easements, except so far as may be necessary to exercise her rights under her other easements of ingress or egress or the installation, maintenance and repair of utilities, or to service her garage structure, and will enjoin her from such activities inconsistent with this declaration. Because the court finds, however, that the plaintiffs have failed to establish that any of the defendant's

12

activities have resulted in alterations to their land which are extant, the court will not order her to restore any portion of the plaintiffs' land. Finally, the court will declare that the defendant has no right to enter upon, pass over or use any portion of the plaintiffs' land which is not encumbered by easements granted to her by her grantor and will enjoin her from such activities except as may be specifically ordered herein.

With respect to count III, as noted *infra*, the court has already entered summary judgment for the defendant on this count. However, as noted in the order granting summary judgment and herein, the depth of the garage is actually 22 feet, two inches while the deed allowing the defendant to replace the old garage allowed her maximum dimensions of 22 feet by 18 feet. Thus, the defendant has exceeded the depth dimension of the garage she was permitted to build by two inches. There is no evidence that this miscalculation affects the size of the exclusive garage easement but, because the garage maintenance easement is defined by reference to the site of the garage itself, there is an expansion of that garage maintenance zone by two inches on to the plaintiffs' property beyond what the deed permits.

For the same reasons earlier expressed herein, the court will not order the defendant to shorten her garage by two inches. Instead, as the plaintiffs have asked for "further relief as the court deems just" the court will award them damages using the same formula as applied for the encroachment of the west wall, namely $3.89 per square foot. Applying this as a multiplier to an area of two inches times 16 feet, 3 1/4 inches,[6] the loss in value to the plaintiffs by the excess length of the defendant's garage is $10.13 ($3.89 x 2.6 sq. ft. = $10.13). Accordingly, the court will order the defendant to pay the plaintiff $10.13 in damages by virtue of the overburdening of the garage

---

[6] The court has used the dimensions offered by the plaintiffs in making this calculation as to the width of the garage. *See* Plaintiff's Proposed Findings of Fact, ¶ 57.

easement and concomitant expansion of the garage maintenance easement by two inches.

What remains as to count IV of the Second Amended Complaint is the plaintiffs' claim that Hotch's garage is a common law nuisance by virtue of its second story and its use by the defendant. The plaintiffs argue that these circumstances would be actionable as a statutory nuisance if they occurred on the defendant's own property,[7] but claim that because they occur on their property, they amount to a common law nuisance which ought to be enjoined.

According to *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 36, 774 A.2d 366, 377, the following must be proven to establish a common law action in nuisance:

> (1)   The defendant acted with the intent of interfering with the use and enjoyment of the land by those entitled to that use;
> (2)   There was some interference with the use and enjoyment of the land of the kind intended, although the amount and extent of that interference may not have been anticipated or intended;
> (3)   The interference that resulted and the physical harm, if any, from that interference proved to be substantial . . . The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct;
> (4)   The interference that came about under such circumstances was of such a nature, duration or amount as to constitute unreasonable interference with the use and enjoyment of the land. . . .

(citing W. Page Keeton, et al., PROSSER AND KEETON ON THE LAW OF TORTS § 87 at 622-23 (5th ed. 1984)).

In the court's view, the plaintiffs have not provided sufficient evidence to support these four elements. First, there is no evidence that Hotch acted with the intent to interfere with the use of the land of the plaintiffs, or their predecessors in title, namely Richard Nightingale and the Tarrants. The unrebutted evidence is that the slight incursion on the plaintiffs' land was inadvertent, that Hotch had reason to believe

---

[7] The court has ruled against the plaintiffs on this claim. *See* Decision and Order of December 13, 2002.

14

that the structure and its uses did not violate any ordinances, and, as found by this court, the "second story' of the garage and its uses were permitted by her deed from Mary Nightingale. *See* Decision and Order of December 13, 2002.

As to elements two and three of this cause of action, even if harm were intended, it is not substantial. As noted, the incursion on to the plaintiffs' land is measured by a few inches, either as to the location of the west wall or as to the length of the garage. This intrusion on to the plaintiffs' land existed before they purchased the property and was not discovered by them until disputes arose between them and Hotch. As importantly, there is no persuasive evidence that the value of the Lyons' property has been affected by the dimensional aspects of the garage or its use. That the plaintiffs are irritated by the existence of these circumstances has more to do with the mutual animosity between the parties than it does with any reasonable assessment that the garages does, or might, cause discomfort or actionable annoyance to these plaintiffs. All this being so, it must also be concluded that Hotch's interference with the plaintiffs' land, while permanent, does not constitute unreasonable interference with its use and enjoyment by the plaintiffs.

Judgment will be entered for the defendant on the plaintiffs' claim of common law nuisance articulated in count IV.

In count V, the plaintiffs ask for an injunction ordering the defendant to remove her "illegally constructed" deck which they say is in violation of Owls Head's zoning ordinance and is therefore a statutory nuisance.

As the Law court held in *Charlton v. Town of Oxford*, 2001 ME 104, ¶¶ 17-21, 774 A.2d 373-374, absent an express grant of a private right of action to remedy a violation of a zoning ordinance, none exists, and only the town may bring an action enforcing its ordinance. *See also* Decision and Order, December 13, 2002, p. 10. Accordingly, the

15

plaintiffs' remedy for Hotch's alleged violation of Owls Head's zoning ordinance is through that town's municipal officials and not via this private civil action.

Testimony at trial would support a finding that the deck encroaches upon the Lyons' property. That claim, however, was not articulated in the Second Amended Complaint nor in any of its predecessor pleadings. Moreover, the plaintiffs never sought to reamend their pleadings during or after trial to raise this claim as M.R. Civ. P. 15(b) would permit. Instead, the plaintiffs in their Post-Trial Brief say that they have alleged that the deck exceeds the defendant's easement rights of ingress and egress over the plaintiffs' property. They cite the court to paragraphs 21 and 22 of the Second Amended Complaint as the place where these claims may be found. A fair reading of these paragraphs and the complaint as a whole shows that the "structure" referred to in paragraphs 21 and 22 as violating the defendant's easement rights and as trespassing on the plaintiffs' property is the garage. See, e.g., ¶¶ 6, 9, 10, 11, 21 and 22 of Second Amended Complaint. The only references to the offending deck are found at paragraph 12 and in count V of this pleading which alleges that the deck violates Owls Head's zoning ordinance. Indeed, in paragraph 12, the plaintiffs refer to the garage as the "structure" as they did throughout the pleading. So, while a civil complaint should not be subjected to hyper-technical scrutiny, it nevertheless ought to concisely and directly inform its recipient of the plaintiffs' grievance. M.R. Civ. P. 8(e). Here the plaintiffs have had five opportunities to allege that the defendant's deck encroaches on their property rights and have not done so.[8] The court will not now interpret their final pleading to include a claim not before articulated.

---

[8] Even if the issue of the deck's intrusion on to the plaintiffs' property were properly before the court, no evidence was presented as to appropriate remedies for this alleged incursion as *Walsh v. Johnson*, 608 A.2d 776, 778, would require so that the court could weigh the equities of the deck's removal versus its impact on the defendant versus potential monetary damages which might be awarded.

16

Judgment is to be entered for the defendant on count V.

In count VI, the plaintiffs grieve the defendant's planting of arbor vitae trees along their common boundary which, they say, violates 17 M.R.S.A. § 2801 or amounts to a common law nuisance. They ask the court to order the trees' removal or, alternatively, that they be maintained so they will not interfere with the plaintiffs' views.

With respect to these claims, the court finds that Hotch planted a row of approximately six arbor vitae trees on her own property with the intent to provide her and her companion greater privacy. The court also concludes that she did not install these plantings out of any sentiment of malice or to annoy the Lyons, although their mutual dislike undoubtedly added to her wish to enhance her privacy. That being so, the court cannot find an actionable private nuisance via 17 M.R.S.A. § 2801.

Although the evidence of Hotch's intent to interfere with the Lyons' use of heir land is marginal, the court finds the plaintiffs have established the first two elements of a cause of action for a common law nuisance as explained in *Charlton v. Town of Oxford*, *id*, at ¶ 36, 774 A.2d at 377. Indeed, it must have been apparent to Hotch that this arbor vitae hedge would eventually obstruct the plaintiffs' views from the northeasterly side of their house and porch out to Penobscot Bay. The court finds that his would, in all likelihood, reduce the value of the plaintiffs' house, because, as noted *infra*, the attraction of and value of this property is its saltwater frontage and related views. In the court's view, then, if the trees are permitted to grow and are not trimmed, they would amount to an unreasonable interference with the plaintiffs' use of their land, even though they have other open views of the ocean from the east side of their home. Moreover, equitable remedies would be appropriate in such circumstances in that the injury prevented would outweigh any harm to the defendant by ordering her to trim

17

the height of the trees. *See Ingraham v. University of Maine at Orono*, 441 A.2d at 693. Accordingly, and consistent with the reasons outlined in this Decision and Order as to equitable remedies granted to the defendant on her amended counterclaim, the court will order the defendant to limit the height of these trees at the approximate height they are shown in plaintiffs' exhibit 42, namely seven feet.

In count X, the plaintiffs make a claim for compensatory and punitive damages for the defendant's knowing or reckless causing of emotional distress to the plaintiffs. If this count purports to allege the negligent infliction of mental suffering, our case law requires proof of foreseeability and severe emotional distress in order to recover. *Gammon v. Osteopathic Hospital of Maine*, 534 A.2d 1282, 1285 (Me. 1987). Neither was proven here.

As to any claim of intentional infliction of emotional distress, it, too, requires severe emotional distress, that is, emotional distress "that no reasonable man could be expected to endure it." *Vicnire v. Ford Motor Credit Co.*, 401 A.2d 148, 154 (Me. 1979). No evidence that either plaintiff suffered from such distress was presented.

Finally, no persuasive evidence was presented that either plaintiff suffered emotional distress as the result of any tortious behavior on Hotch's part. At most, Marilyn testified that she thought the defendant was intimidating and demanding. Maine has yet to provide a cause of action yielding damages for emotional distress because of the demeanor or words of an unpleasant neighbor.

Judgment is to be entered for the defendant on count X of the Second Amended Complaint.

### III. Defendant's Claims.

As earlier explained, the defendant has addressed her grievances concerning the parties' septic system in eight of the 16 counts which require dispositive action.

18

In counts I and II, the defendant says that some parts of the parties' dual wastewater system are exclusively hers and that the court ought to declare them as such and enjoin the plaintiffs from interfering with them. She also says that other parts of the system are owned in common and that the court ought to find that she has an equal right to access those parts, even if they are on the plaintiffs' property, and that neither party has the right, except in emergencies, to unilaterally affect those parts by their repair, maintenance or the like. Accordingly, she also wants the plaintiffs enjoined from handling those components of the system, except an external control switch and alarm, and from working on the system without qualified professionals to do this work.

The portion of the deed from Mary Nightingale to Hotch which describes the latter's request as to the components of this common system reads:

> ALSO GRANTING to Grantee a perpetual right and easement to use, in common with Richard A. Nightingale, his heirs, personal representatives and assigns, a certain septic lift pump and leach bed system and related pipes, lines and conduits leading from the pump to the leach bed system affixed to and associated with a dual subsurface wastewater disposal system situated on property of said Richard A. Nightingale as depicted on the Plan. Grantee is granted an exclusive perpetual right and easement to use a certain septic tank and related pipes, lines and conduits situated on property of Richard A. Nightingale as depicted on the Plan, which is connected from the common lift pump described above to the residence situated on Grantee's property. Grantee shall have the right to enter upon said property of Richard A. Nightingale for the purpose of inspecting, maintaining, repairing and replacing any portion of the subsurface waste disposal system, including those portions used in common with Richard. A. Nightingale and those portions used exclusively by Grantee. Following any excavation for maintenance, repair or replacement, the land shall be restored to its original condition. The cost for the maintenance, repair and replacement of any portion of the subsurface waste disposal system used in common by Richard A. Nightingale and Grantee, including the cost of restoring the land to its original condition after such work, shall be shared equally by Richard A. Nightingale, his heirs, personal representatives and assigns, and Grantee. The cost of any maintenance, repair and replacement of any portion of the subsurface waste disposal system used exclusively by Grantee, including the cost of restoring the land to its original condition after such work, shall be paid entirely by Grantee.

19

Pl.'s exh. 5.

From this text, it is plain that the only exclusive right and easement the defendant has to parts of this system on the plaintiffs' land is the holding tank and the pipes and the conduit leading to it from her house, and the pipe leading from the tank to the common lift pump.[9]

Although a principal debate at trial in this case as to the meaning of the defendant's exclusive easements concerned her parking and garage easements, the defendant wants the court to establish that only she, to the exclusion of the plaintiffs, has the right to those parts of the septic system which her deed characterizes as exclusive.

The plaintiffs take the position that an exclusive easement only excludes others who are the owners of neither the dominant estate nor the servient estate; that is, that an exclusive easement simply means that the easement is exclusive to the owner of the dominant estate as against all others, but does not eliminate the owner of the servient estate's rights to that aspect of the property. Were an exclusive easement to eliminate the rights of the servient owner, they say, the conveyance of the exclusive easement would convey more than an easement, namely full title to the property in question which, as to real estate, would be an interest in fee. Because no interest in fee was conveyed, the reasoning goes, some interest was retained by the servient owner and the easement right of the dominant owner, even if termed "exclusive," does not terminate the rights of the servient estate. For this proposition the plaintiffs cite 3 POWELL ON REAL ESTATE which advises that a conveyance of an unlimited use or enjoyment of land is, in effect, a conveyance of ownership and not of an easement. Here, however, Hotch

---

[9] Obviously the line from her house on her own property to the system is solely the defendant's. The court understands the conduit is the pipe containing electrical wires from the defendant's home to the pump.

20

has not been conveyed an unlimited use of real property, only the exclusive use of pipes and conduits which does not provide her with an unlimited use of the property through which they run. That being so, even under the law on which the plaintiffs rely, the defendant's conveyed use does not become a conveyance of the fee.

The court declines to adopt the plaintiffs' approach to this legal dispute and instead concurs with the RESTATEMENT (THIRD) OF PROPERTY, which instructs that,

> Grant of an exclusive easement deprives the servient owner of the right to use either the entire area covered by the easement, or, more frequently, of the right to use facilities installed for enjoyment of the easement. Easements for pipelines and power lines and poles are generally intended to be exclusive: the servient owner may use the area through which the lines run in ways that do not interfere with the lines, but is not entitled to use the pipeline, power lines, or power poles.

RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 5.9 cmt. b; AMERICAN LAW INSTITUTE, 2000. *Contra* 25 Am. Jur. 2d *Easements and Licenses* § 98, n.76.

Applying this guidance to this aspect of the parties' dispute, the conclusion must be that the defendant's right to the septic tank and related pipes, lines and conduits under the plaintiffs' property are exclusively hers to the exclusion of the Lyons' and all others.

Additionally, to the extent the use of the words "exclusive right and easement" may be considered ambiguous, the deed "may be examined in the light of the circumstances surrounding its execution. It may be interpreted with reference to the reason, or motive, upon which the Grantor proceeded in using the language in question." *C Company v. City of Westbrook*, 269 A.2d 307, 309 (Me. 1970). Moreover, "in a question of ambiguity the deed must be construed more favorably to the Grantee." *Id.* According to the testimony of Richard Nightingale, who negotiated the sale of his wife's property to the defendant and was the former's grantor, the intent of the deed was that each property, his and Hotch's, would have its own tank and that the wires

21

leading from her house to the pump would be exclusively hers. This was an important consideration in the sale of what was to become Mary's lot, as it could not have been sold without it.

Next, it ought to be recognized that the text references an exclusive right and easement to use this portion of the septic system. Thus, not only is the easement exclusive so also is the right to use this part of the system. Indeed, it is hard to conceive of a contrary conclusion as the pipes and conduit only serve the grantee's home and in no way assist with the disposal of the septic waste from the Lyons' house.

For these reasons, the court must find and declare that the portions of the septic system described in the Nightingale to Hotch deed are exclusive to her and bar the plaintiffs from handling or otherwise interfering or affecting these exclusive components and they are to be enjoined from doing so.

With reference to the defendant's rights to the remainder of the system, the text of the deed quoted, *infra*, informs that Hotch, as grantee, has a perpetual right and easement in common with Richard Nightingale and his assigns to use the septic lift pump, leach bed and related pipes, lines and conduits from the pump to the leach field found on Nightingale's, now Lyons' property. She also is given the right to enter upon her neighbor's land for the purpose of "inspecting, maintaining, repairing and replacing, any portion of the subsurface waste disposal system" used in common with Nightingale or which are exclusively hers. Pl.'s exh. 5.

The parties debate whether this deed gives Hotch title to this part of the septic system as co-tenant in common with Lyons, or simply the right in common to use the system. In the court's view, the deed is unambiguous in its grant of an easement to Hotch to use the pump, leach bed and related pipes and lines. Because this is a right to use, and is characterized as an easement, no title is provided to Hotch beyond these

22

rights. Thus, that the use of the septic system is in common with Nightingale, now the Lyons, does not transform Hotch's rights to that of tenant-in-common with ownership of the system. However, as the grantee of an easement to use this portion of the septic system, the court must declare that she has the right to do so and further that she has the right, as the deed provides, to enter on the Lyons' property to inspect, maintain, repair and replace portions of the system which she has the right to use in common with them. *See also* 25 Am. Jur. 2d *Easements*, § 95. The right to inspect and repair, however, "can be exercised only when necessary, and in such a reasonable manner as not to increase needlessly the burden on, or go beyond the boundaries of, the servient estate." *Id*. By the same token, "no material alterations can be made by either the servient owner or easement owner without the other's consent." *Id.*, § 96. Thus, not only would the law advise, but so would the deed itself, that these parties are to respect each other's interest in this commonly used septic system.

Unfortunately, probably due to the mutual animosity between the parties, the defendant asks the court to declare what the law and the deed obviously require and provide specific directions in this regard. The court may do so as it has the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed." 14 M.R.S.A. § 5953. It is "an appropriate vehicle for establishing rights in real property." *Hodgdon v. Campbell*, 411 A.2d 667, 669 (Me. 1980). The Act "is remedial in nature and should be liberally construed to provide a simple and effective means by which parties may secure a binding judicial determination of their legal rights, status or relations under . . . written instruments where a justiciable controversy has arisen." *Id*.

Thus, while the court has declared that the defendant has the equal right to use and maintain the system so, too, do the plaintiffs who must depend on this septic system and who have common rights to use it. Consistent with that declaration, neither

party has the right to affect its operation in a unilateral fashion to the potential detriment of the other user, except in emergencies. Additionally, because no septic system is eternal and changes or repairs may become necessary, a party may undertake such repairs and look to the other party for equal contribution for the costs if the parties do not cooperate in advance for such arrangements. Moreover, the court must also declare and direct that repairs and maintenance must be performed by people competent and, where so required, licensed to undertake the inspection, repair and maintenance of this septic system as count II requests. To do otherwise would be to allow less than what the deed and common sense suggest.

Finally, the court declines to declare, as the defendant would wish, that the plaintiffs have no right to "handle" components of the common system. The plaintiffs' rights are equal to those of the defendant although the deed is silent as to their rights to inspect, maintain and repair the septic system. As the co-user of the system which rests beneath their property, it is most unlikely that their predecessors-in-title intended to cede their rights to maintain a septic system on which these property owners must rely.

In Count IV, the defendant alleges that she had an agreement with the plaintiffs to reconnect the wires that Francis cut between her home and the septic pump. The court concludes that the defendant has neither pled nor proven the elements of a contract as there was no evidence of exchange of consideration for this agreement or for the plaintiffs' performance thereunder. Moreover, even if the defendant had proven the elements of a breach of contract, she established no damages occasioned by the alleged breach because her septic waste was eliminated from her home notwithstanding the break in the pump wire.

She also alleges in this count that there was an agreement between her and the plaintiffs to alternate the septic control switch between their respective houses on a

24

monthly basis. The defendant failed to establish the elements of a contract here as well. Her testimony was that she suggested a schedule for the control switch but that Francis merely walked away when this offer was made. That he did alternate the switch monthly afterwards for a while fails to demonstrate a meeting of the minds and mutual assent to the alleged agreement. Moreover, as before, there was no evidence of consideration for this agreement and no evidence of damages upon its breach.

Judgment is to be entered for the plaintiffs on this count.

In count V, the defendant asks for specific performance of the agreement to alternate on a monthly basis the control of the septic pump control switch. Because the court has found that there was no such enforceable agreement, judgment is to be entered for the plaintiffs on this count.

In count VIII, the defendant requests a declaratory judgment that a monthly changeover of the septic pump switch from one party's house to the other's is fair and equitable as would a like arrangement to share costs of electricity to power the water pump, and to take care of snowplowing and mowing.

By including this count in her counterclaim, it is evident that the defendant wishes the court to order the regulation of the parties' respective actions as she asked in counts I and II. In this count, however, not only is there less guidance in the deed as to the governance of pumps, the allocation of the costs for their use, and for mowing and plowing, little evidence was presented on these topics. Under such circumstances, the court would be justified in dismissing the count or refusing to exercise its authority under the Declaratory Judgments Act, 14 M.R.S.A. § 5951 *et seq.* However, the patent inability of these parties to share responsibility for their mutual interests in a harmonious, or even civil, fashion convinces the court that it must exercise this statutory authority although to do so reaches for the outer limits of its declaratory

25

judgment authority. To do otherwise would result, the court believes, in further quarrels, more litigation, and further exhaustion of this court's resources that will be devoted to their resolution. Thus, the court finds that there is a justiciable controversy here because each party can claim a right or interest in the cost of powering these pumps and of maintaining their driveway and right-of-way. *Desmond v. Persina*, 381 A.2d 633 638 (Me. 1978). Moreover, at least one party, the defendant, has expressed a claim of right as to these issues which warrants judicial protection. *Id.* So, because the Declaratory Judgments Act is remedial in nature and is to be liberally construed, *Perry v. Hartford Accident and Indemnity Co.*, 481 A.2d 133, 136 (Me. 1984), and the controversy here is sufficiently "real" because it involves a claim of right buttressed by a substantial property interest to which the plaintiffs are antagonistic, *id.*, the court will exercise this authority. Indeed, as noted, it would create a hardship to the parties if it did not do so. *Wagner v. Secretary of State*, 663 A.2d 564, 567 (Me. 1995).

The deed from Nightingale to Hotch provides that the cost of maintenance of the common septic system, the well, the gravel driveway, and the 12-foot way are to be shared equally by Nightingale, his assigns, and the grantee, Hotch. Maintenance, that is, keeping something in a suitable condition, obviously involves plowing and, occasionally grading a driveway. It also means mowing grassy areas so that they do not become overgrown, particularly in a compact residential area. Because such work is primarily seasonal, a month-to-month exchange of these responsibilities is inappropriate. Instead, in the court's view, it is only sensible to share these costs by alternating them annually, and the court will so order.

The cost to run the septic and well pumps is, of course, different in that the cost of the electricity for this purpose is "maintenance" only in the broadest sense of that word. Moreover, the use of these items by the parties will differ and an electricity bill

26

ordinarily does not segregate the cost of a particular appliance such as a pump. Finally, while the court understands that the defendant is currently paying the bill for the water pump, it also understands that a switch for the septic pump can vary this cost from house-to-house. Accordingly, the court believes it has no basis to order the sharing of these electrical costs and fears that were it to do so, it would simply generate more controversy between these parties. Instead, these cited difficulties notwithstanding, the court will order the defendant to continue to pay for power for the water pump and the plaintiffs to pay for power for the septic pump. In the court's view, in the absence of any other information, such a division is equitable and in concert with the grantor's intent to share the costs of these common systems.

In Count IX, the defendant alleges that the plaintiffs have trespassed on her property rights by cutting the wires from her home to the septic pump, working on their common septic system without her consent, entering upon her exclusive parking and garage easements without her permission and damaging her ornamental trees. She also asks in count X of the counterclaim for statutory and punitive damages for the destruction of her trees. In counts XI and XIX, she asks for injunctive relief ordering the plaintiffs not to enter on her property, not to dump material on their property or to use their property in such a manner that the defendant would be harmed. Finally in count XVII, the defendant alleges that her property was injured by the plaintiffs' negligence.

With reference to the claim that the plaintiffs trespassed on Hotch's property rights by cutting the wires running from her house to the septic system, judgment must be entered for the defendant on this claim because, as discussed, *infra,* certain components of the septic system are hers to the exclusion of the Lyons' and the latter have no right to interfere with this interest of the defendant. However, the defendant has established no actual damages occasioned by this trespass, so nominal damages of

$10 are to be awarded to her on this claim, but punitive damages are not to be awarded as malice, actual or implied, was not proven.

Hotch, as noted, also alleges a trespass by virtue of Francis' work on the common elements of the parties' septic system without her consent. However, because the rights to this system are in common, because the system is located primarily on the plaintiffs' property, and because the plaintiffs are obliged to share in the costs of maintenance and repair of the system, the court can find no trespass by virtue of Francis' work on the common elements of the system. Moreover, as noted herein, his work on this system caused no injury or damage to the defendant or her property. Accordingly, judgment must be entered for the plaintiffs on this claim in count IX.

The defendant also says that the plaintiffs trespassed on her exclusive parking and garage easements. With respect to the latter claim, the defendant presented no evidence, so judgment must be entered for the plaintiffs on this aspect of her trespass claim.

The defendant did, however, present evidence that deliverymen and plaintiffs' weekend guests parked in the exclusive parking area. While it is reasonable to infer that the latter parked there at the request or guidance of the plaintiffs, there is nothing in the evidence to show that deliverymen parked there except upon their own initiative. Thus, the court finds that an occasional trespass by a guest of the plaintiffs did occur on the defendant's exclusive parking easement. The defendant established no damages for this invasion of her rights, however, so the same nominal damages of $10 are to be awarded on this claim, but punitive damages are not.

In reaching the conclusion that the plaintiffs' guests trespassed on the defendant's exclusive parking easement, the court concludes, as it did with her exclusive rights to certain elements of the septic system, that the rights conveyed to the

28

defendant in that portion of the parking area denominated as "exclusive" means that the grantor and his assigns, the Lyons, have no right to its use. Not only does the law cited herein support this conclusion, so does the intent of the parties to the deed which conveyed these rights as well as the text of the deed itself.

The deed follows a plan in which certain easement rights are given exclusively to grantee Hotch, and others are conveyed to her to use in common with the grantor and his assigns. The obvious purpose of these different characterizations of these easements is to distinguish between those which only the grantee may use and those which both parties may use. Were the grantor to retain rights to these exclusive areas there would be no need to call them "exclusive" while describing those to which he and his assigns retain access as "common."

The testimony of Richard Nightingale, whose original deed to his wife created these easements, confirms this conclusion. At trial he testified that his intent was to convey an exclusive easement as to the garage and the parking area so that Mary, then Hotch, would be the "owner" of these areas, that is, the owner of his property would not be permitted to go on that property or use it.

Thus, as earlier concluded, the easements characterized as "exclusive" in the deed from Richard to Mary Nightingale, and then to Hotch, means that only the grantee may use that portion of the property and the grantor may not.

With reference to the two damaged arbor vitae trees, the defendant presented persuasive evidence at trial that they were poisoned via the application of sodium. She also had a reasonable basis to suspect the plaintiffs of this act of vandalism – their relationship was unpleasant, the Lyons' objected to these trees which blocked their view, and the sodium was applied near to, or on, their common boundary. While such circumstances would support the accusation which has been made here, the defendant

29

has presented no affirmative evidence that the Lyons poisoned her trees. Accordingly, the court must find that she has failed to establish by a preponderance of the evidence this element of her trespass claim, and judgment must be entered for the plaintiffs on this claim.

Because the defendant does not prevail on this claim, she cannot succeed with count X which relies on the statute which authorizes increased damages and costs for injury to ornamental trees, 14 M.R.S.A. § 7552.

In count XI, as noted, the defendant asks for an injunction ordering the plaintiffs not to dispense material on their property which might damage the defendant's. Presumably, this request is based on the belief that the plaintiffs spread sodium on or near their property to poison trees on the defendant's land. As the court has found that the defendant has not proven this claim, and there being no other basis to enter such an injunction, the court will decline to do so and judgment will be entered for the plaintiffs on count XI of the counterclaim.

With respect to count XIX, because the plaintiffs have trespassed on the defendant's land and because the parties have contested their respective rights to the defendant's easements, the court will declare and find that the defendant's rights to easements denominated as exclusive in the Nightingale to Hotch deed are hers to the exclusion of the plaintiffs. Accordingly, the plaintiffs are to be enjoined from entering on the property held by the defendant in fee or entering on or interfering with the easement rights denominated as exclusive in the deed cited.

In count XII, the defendant asks for a declaratory judgment as to the responsibility for costs to remove plants and restore the land should the plaintiffs' land need to be excavated to access the common septic system for repairs or maintenance. She worries that the installation of landscaping in the form of rocks and plants over or

near the septic system will result in extra costs to her under these circumstances as the deed requires her to share in the costs cited.

While the evidence addressed at trial showed that the plaintiffs' plantings near the septic system were modest and unlikely to generate significant costs if excavation were necessary, for the reasons already explained herein, in the court's view, it is prudent to address this aspect of the parties' contentions.

The deed provides that "Following any excavation for maintenance, repair or replacement, the land shall be restored to its original condition." Pl.'s exh. 5. It also provides, "the cost of restoring the land to its original condition after such work, shall be shared equally by Richard A. Nightingale his . . . assigns, and Grantee." *Id.*

The deed also provides that the grantee, Hotch, has the right to enter on plaintiffs' land to inspect, maintain and repair their common septic system. Obviously plantings, gardens and other impediments which would prevent her from doing so or which would entail significant costs to her would substantially interfere with this property right. It also follows that should excavation of the septic system become necessary, she should not be required to pay to remove and then replace her neighbor's plantings in order to exercise property rights that she obtained before such plantings were made. Accordingly, the court will declare and find that the defendant's responsibility for costs of excavating and then restoring the land after work on the common septic system is to be limited to the costs of restoration of the land as it originally appeared when she purchased her property in 1989. Any additional costs for restoring the land occasioned by subsequent plantings must be borne by the plaintiffs.

In counts XIII and XIV, the defendant grieves the plaintiffs' removal and taking of her driveway lamp and asks for damages and declaratory relief as to her right to have the parties' driveway illuminated.

31

As Marilyn acknowledged at trial, her husband took Hotch's driveway lamp. No justification was offered for this act either then or at trial. Accordingly, the defendant is entitled to an award of damages for this taking which has been established as $15.80. In the court's view, the defendant is also entitled to punitive damages as the only explanation for the taking of the defendant's property is the malice of Francis in doing so as part of the ill will the parties have entertained toward one another. Even if such malice were not expressed, the taking of the defendant's driveway lamp was obviously deliberate and so outrageous that malice may be inferred. *Tuttle v. Raymond*, 494 A.2d 1353, 1361 (Me. 1985). Such malicious intent, express or implied, has been established by clear and convincing evidence.

Punitive damages in the sum of $1,000 are awarded. The court concludes that this sum is a sufficient deterrence for this conduct and that it is proportionate to the insult done and the modest harm caused to the defendant.

In count XIV, the defendant asks for a declaration that she has the right to illuminate the easements established for access to her home. Again, she seeks court management of the parties' affairs as they may relate to the use of their common easements. For the reasons already outlined herein, the court will accede to this request and find and declare that the defendant has the right to proper enjoyment of her easement rights, provided she does so in a reasonable manner. *Beckwith v. Rossi*, 175 A.2d 732, 735; 157 ME 532, 535-536. Thus, she may illuminate the avenues of ingress and egress to her home over the easements granted to her at such reasonable times and in such reasonable ways as not to interfere with the plaintiffs' uses of their own property.

In counts XV and XVI, the defendant alleges that the plaintiffs have constructed a flagpole which violates the Owls Head zoning ordinance and is therefore a statutory nuisance. She says it also constitutes a common law private nuisance.

As has been previously explained herein, absent a legislative direction to the contrary, there is no private cause of action for nuisance based on the violation of a local zoning ordinance. *Charlton v. Town of Oxford*, 2001 ME 104, ¶ 14, 774 A.2d 366, 372. Because neither the Legislature nor the town have authorized such an action, it may not, therefore, serve as the basis for relief in this court. Accordingly, judgment must be entered for the plaintiffs on count XV of the counterclaim.

As to count XVI, and as discussed earlier in this Decision and Order, four elements must be established to satisfy a claim for a common law cause of action for private nuisance. *Charlton, id.*, 2001 ME 104, ¶ 36, 774 A.2d at 377. None of these have been proven by the defendant. That is, there is no evidence that the plaintiffs constructed their flagpole with the intent of interfering with the use of others' land, that there was interference of the kind intended, that the interference was substantial so that it affected the value of the defendant's land, and that the interference constituted unreasonable interference with the use and enjoyment of the defendant's land. Indeed, the plaintiffs constructed their flagpole near an old one which had deteriorated and their new flagpole is consistent in size and appearance with others constructed by neighbors along the shore.

Judgment must be entered for the plaintiffs on count XVI of the amended counterclaim.

In count XVIII, the defendant claims the plaintiffs have harassed her and cites various examples of such alleged misbehavior in the text of this count. Of these, the only persuasive claim concerns the plaintiffs' theft of her lamp. The others have either

33

been unproven or do not constitute activities, taken either alone or together, which may be characterized as harassment.

Judgment will be entered for the plaintiffs on this count.

## IV. Conclusion.

For the reasons expressed herein, the clerk is DIRECTED to make the following entries:

As to the plaintiffs' Second Amended Complaint:

Count I: Judgment is ENTERED for the plaintiffs. Damages in the sum of $30.57 are AWARDED for the encroachment of the defendant's garage on the plaintiffs' property. Nominal damages in the sum of $10 are AWARDED for the defendant's trespasses on the plaintiffs' property.

Count II: Judgment is ENTERED for the plaintiffs. The court FINDS and DECLARES that the west wall of the defendant's garage encroaches on to the plaintiffs' land. The court ORDERS the defendant to remove the lean-to along that wall and so much of the roof which covers that lean-to, except an area of sufficient depth to permit a narrow soffit.

The court also FINDS and DECLARES that the defendant has no right to mow, plant on, or physically alter any part of the plaintiffs' land not subject to her exclusive parking and garage easements, or except as may be reasonably necessary to exercise her additional easement rights of ingress and egress, or the installation, maintenance and repair of utilities, over the 10-foot wide gravel driveway, the 12-foot way, the parking easement and the garage easement or to service the garage structure, or those portions of the septic system the use of which is common to the parties, or exclusive to her, as cited in the deed from Mary Nightingale to Marilyn Hotch, dated August 31, 1989. The court further FINDS and DECLARES that the defendant has no right to enter upon, pass over, or use any portion of the plaintiffs' land which is not encumbered by easements granted to her by her grantor.

The defendant is ENJOINED from mowing, planting on, or physically altering any part of the plaintiffs' land not encumbered by her exclusive parking and garage easements or except as may be reasonably necessary to exercise her additional easement rights of ingress or egress, or the installation, maintenance and repair of utilities over the 10-foot wide gravel driveway, the 12-foot way, the parking easement and the garage easement or to service the garage easement or those portions of the septic system the use of which is common to the parties or exclusive to her. The defendant is also ENJOINED from entering upon, passing over,

34

or using any portion of the plaintiffs' land not encumbered by the easements granted to her by her grantor.

Count III:   Judgment is ENTERED for the plaintiffs. Damages in the sum of $10.13 are AWARDED for the excess length of the defendant's garage and the expansion of the garage maintenance easement on to the plaintiffs' property.

Count IV:   Judgment is ENTERED for the defendant.

Count V:    Judgment is ENTERED for the defendant.

Count VI:   Judgment is ENTERED for the plaintiffs.   The defendant is ORDERED to trim her arbor vitae trees on or near her property line to a height of seven feet.

Count X:    Judgment is ENTERED for the defendant.

As to the defendant's Amended Counterclaim:

Count I:    Judgment is ENTERED for the defendant.  The court FINDS and DECLARES that the portions of the parties' septic system which are described in the deed from Mary Nightingale to Marilyn Hotch as exclusive to the grantee are exclusively hers to the exclusion of Richard Nightingale's assigns, including the plaintiffs, and all others. Accordingly, the plaintiffs are hereby ENJOINED from handling or otherwise interfering in these exclusive components of the septic system.

The court also FINDS and DECLARES that the defendant has the right to use the rest of the septic system, which rights are in common with the plaintiffs, and the right to enter upon the plaintiffs' property to inspect, maintain, repair and replace those portions of the septic system which she has the right to use in common with the plaintiffs, including turning off or resetting the alarm.  Such a right must be reasonably exercised.

The court also FINDS and DECLARES that no party has the right to affect the common septic system unilaterally except in emergencies, but a party may undertake repairs and maintenance of the system and may look to the other party for equal contribution for reasonable costs attendant to its repair and maintenance if not agreed to in advance and if reasonably necessary.

Count II:   Judgment is ENTERED for the defendant.  The court FINDS and DECLARES that either party may undertake maintenance and repair of the common septic system but must hire qualified, and if the law so requires, licensed people to undertake such work.  Parties are to endeavor to agree to the scope and cost of work in advance of its undertaking.

Count IV:     Judgment is ENTERED for the plaintiffs.

Count V:      Judgment is ENTERED for the plaintiffs.

Count VIII:  Judgment is ENTERED for the defendant. The court FINDS and DECLARES that an equitable division of costs of mowing, plowing and maintaining surface easements in which the parties have common interests is that they will be arranged for and paid on an alternating annual basis with the defendant responsible for odd-numbered years, beginning this year.

The court FINDS and DECLARES that an equitable division of costs of powering the water pump and the septic pump in which the parties share common interests is that the defendant will pay to power the water pump and the plaintiffs will pay to power the septic pump.

Count IX and XVII:  Judgment is ENTERED for the defendant. Nominal damages of $10 are AWARDED for the plaintiffs' trespasses on the defendant's property.

Count X:      Judgment is ENTERED for the plaintiffs.

Count XI:     Judgment is ENTERED for the plaintiffs.

Count XII:    Judgment is ENTERED for the defendant. The court FINDS and DECLARES that the responsibility of the defendant for costs of restoration of the land after excavation for maintenance or repair of the parties' common septic system shall be limited to such costs as would attend excavation of the plaintiffs' land at the time the defendant purchased her property in 1989; any additional such costs occasioned by landscaping or planting thereafter on the plaintiffs' land shall be borne by the plaintiffs.

Count XIII: Judgment is ENTERED for the defendant. Damages, compensatory and punitive, in the sum of $1,015.80 are AWARDED to the defendant on plaintiff Francis Lyons' taking of the defendant's lamp.

Count XIV:   Judgment is ENTERED for the defendant. The court FINDS and DECLARES that the defendant has the right to reasonable enjoyment of her easement rights to ingress and egress her residence which right includes reasonable illumination at reasonable times.

Count XV:    Judgment is ENTERED for the plaintiffs.

Count XVI:   Judgment is ENTERED for the plaintiffs.

Count XVIII: Judgment is ENTERED for the plaintiffs.

Count XIX: Judgment is ENTERED for the defendant. The court FINDS and DECLARES that easements denominated as exclusive to the grantee in the deed from Mary Nightingale to Marilyn Hotch are exclusive to the defendant as grantee to the exclusion of Richard Nightingale, Mary Nightingale, and their assigns, including the plaintiffs. The plaintiffs are ENJOINED from entering on or interfering with the defendant's land held by her in fee or the easement rights denominated as exclusive in the deed cited.

So ordered.

Dated: July 31, 2003

John R. Atwood
Justice, Superior Court

Date Filed __10/6/00__ _____Knox_____ Docket No. __RE-00-018__

County

__MARSANO, J. RECUSES 9/4/01.__

Action ____Easements____

__ATWOOD, J. SPECIALLY ASSIGNED 12/26/0__

FRANCIS X. LYONS and MARILYN C. LYONS vs. MARILYN L. HOTCH

| Plaintiff's Attorney<br>Christopher C. Taintor, Esq.<br>PO Box 4600<br>Portland ME  04112-4600<br>774-7000 | Defendant's Attorney<br>Randal E. Watkinson, Esq.  **W/D 6/10/02**<br>PO Box 248<br>Rockland ME  04841-0248<br>594-8400<br><br>Marilyn Hotch, Pro Se<br>92 Bellevue St<br>Owls Head ME  04854<br>596-7847 |
|---|---|

| Date of Entry | |
|---|---|
| 10/10/00 | On 10/6/00, Complaint,filing fee and Summary Sheet filed.<br>Case File Notice mailed to Attorney Taintor. |
| 10/13/00 | Return of Service on Summons filed:<br>-Marilyn L. Hotch served on 10/5/00 in hand. |
| 10/24/00 | Motion for Enlargement of Time and Proposed Order filed by Attorney Randal Watkinson. |
| 11/13/00 | On 11/6/00, Defendant's Answer and Counterclaims filed by Attorney Watkinson. |
| 11/16/00 | On 11/15/00, Order filed:<br>Without objection, Defendant's motion for an enlargement of time is hereby granted. The Defendant shall file her Answer and any counterclaims on or before November 7, 2000.<br>The Order dated Nov. 15, 2000 is incorporated in the docket by reference.<br>Dated: 11/15/00<br>Atwood, J.<br>Copy mailed to Attorneys Taintor and Watkinson. |
| 11/16/00 | On 11/15/00, Scheduling Order filed:<br>Discovery deadline is July 15, 2001.<br>Dated: 11/15/00<br>Atwood, J.<br>Copy mailed to Attorneys Taintor and Watkinson. |